**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, the STATE OF WEST VIRGINIA, by and through the WEST VIRGINIA DEPARTMENT OF ENVIRONMENTAL PROTECTION, the COMMONWEALTH OF VIRGINIA, and the PENNSYLVANIA DEPARTMENT OF ENVIRONMENTAL PROTECTION, | ) ) ) ) ) | 2:15-cv-11838 |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | |
| ARCH COAL, INC.; HAWTHORNE COAL CO., INC.; ICG BECKLEY, LLC; ICG EAST KENTUCKY, LLC; ICG EASTERN, LLC; ICG KNOTT COUNTY, LLC; ICG TYGART VALLEY, LLC; JULIANA MINING COMPANY, INC.; KING KNOB COAL COMPANY, INC.; PATRIOT MINING COMPANY, INC.; POWELL MOUNTAIN ENERGY, LLC; THE SYCAMORE GROUP, LLC; VINDEX ENERGY CORP.; WHITE WOLF ENERGY, INC.; and WOLF RUN MINING CO., | ) ) ) ) ) ) ) ) ) ) ) | CONSENT DECREE |
| Defendants. | ) | |

## TABLE OF CONTENTS

I. BACKGROUND ............................................................................................... 1

II. JURISDICTION AND VENUE ...................................................................... 5

III. APPLICABILITY ........................................................................................... 6

IV. DEFINITIONS .............................................................................................. 10

V. CIVIL PENALTY ......................................................................................... 15

VI. COMPLIANCE REQUIREMENTS ............................................................ 17

VII. INJUNCTIVE RELIEF ................................................................................ 21

VIII. REPORTING REQUIREMENTS ............................................................... 34

IX. STIPULATED PENALTIES ........................................................................ 37

X. FORCE MAJEURE ...................................................................................... 42

XI. DISPUTE RESOLUTION ............................................................................ 44

XII. INFORMATION COLLECTION AND RETENTION ............................... 46

XIII. EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS .................. 49

XIV. COSTS .......................................................................................................... 51

XV. NOTICES ...................................................................................................... 51

XVI. RETENTION OF JURISDICTION ............................................................ 53

XVII. MODIFICATION ......................................................................................... 54

XVIII. TERMINATION ........................................................................................... 54

XIX. PUBLIC PARTICIPATION ........................................................................ 55

XX. SIGNATORIES/SERVICE .......................................................................... 55

XXI. INTEGRATION ........................................................................................... 56

i

**XXII. FINAL JUDGMENT** ................................................................................... **56**

**XXIII. APPENDICES** .......................................................................................... **57**

# I.  BACKGROUND

A.     On March 1, 2011, the United States, West Virginia, and Kentucky concurrently filed a complaint and lodged a Consent Decree against Arch Coal, Inc. ("Arch") and its subsidiaries with operations in West Virginia, Virginia, and Kentucky resolving alleged violations of the Clean Water Act and related state statutes (the "Arch Consent Decree").  The Arch Consent Decree imposes ongoing injunctive relief requirements on Arch and its subsidiaries to bring them into compliance with the Clean Water Act.

B.     After a public notice and comment period, the United States moved to enter the decree on May 2, 2011.

C.     On June 15, 2011, Arch acquired through merger International Coal Group, Inc. ("ICG"), including its subsidiaries Hawthorne Coal Co., Inc.; ICG Beckley, LLC; ICG East Kentucky, LLC; ICG Eastern, LLC; ICG Hazard, LLC; ICG Knott County, LLC; ICG Tygart Valley, LLC; Juliana Mining Company, Inc.; King Knob Coal Company, Inc.; Patriot Mining Company, Inc.; Powell Mountain Energy, LLC; The Sycamore Group, LLC; Vindex Energy Corp.; White Wolf Energy, Inc.; and Wolf Run Mining Co. (collectively, "the ICG Defendants").

D.     On November 7, 2011, the United States District Court for the Southern District of West Virginia entered the Arch Consent Decree.  (Dkt. #35-36 in Civ. No. 2:11-cv-00133, S.D. W.Va.).  This Consent Decree is intended to operate in conjunction with the Arch Consent Decree in order to provide consistent, company-wide injunctive relief.  However, each document speaks for itself and: (i) nothing in this Consent Decree shall alter or amend the provisions of the Arch Consent Decree, (ii) nothing in the Arch Consent Decree shall alter or amend the provisions of this Consent Decree, and (iii) the provisions of the Arch Consent Decree are not incorporated herein except where

1

specifically referenced.

     E.     Concurrent with the lodging of this Consent Decree, Plaintiffs, the United States of America on behalf of the United States Environmental Protection Agency ("EPA"), the State of West Virginia, by and through the West Virginia Department of Environmental Protection ("WVDEP"), the Commonwealth of Virginia, by and through the Virginia Department of Mines, Minerals, and Energy ("VADMME"), and the Pennsylvania Department of Environmental Protection ("PADEP") have filed a Complaint in this action against Arch and the ICG Defendants (collectively, "Defendants"). The Complaint alleges that Defendants violated Sections 301 and 402 of the Federal Water Pollution Control Act as amended by the Clean Water Act of 1977 and the Water Quality Act of 1987 ("CWA" or the "Act"), 33 U.S.C. §§ 1311 and 1342; the West Virginia Water Pollution Control Act ("WPCA"), W. Va. Code § 22-11-8; the Virginia State Water Control Law, Va. Code § 62.1-44.2, *et seq.*; and the Pennsylvania Clean Streams Law ("PCSL") 35 P.S. §§ 691.301, 691.307, 691.315 and 691.601. Specifically, the Complaint alleges that Defendants violated Section 301 of the Act, W. Va. Code § 22-11-8, Va. Code § 62.1-44.5, and the PCSL, 35 P.S.§§ 691.301, 691.307, 691.315, by discharging, and continuing to discharge, pollutants in violation of the conditions and limitations of National Pollutant Discharge Elimination System ("NPDES") permits issued to Defendants pursuant to Section 402 of the Act, 33 U.S.C. § 1342, Section 8 of the WPCA, W. Va. Code § 22-11-8, Va. Code § 45.1-254, and Section 301 of the PCSL, 35 P.S. § 691.301.

     F.     Defendants do not admit any liability to the United States or the States arising out of the transactions or occurrences alleged in the Complaint nor do Defendants admit any fact or legal conclusion alleged in the Complaint.

     G.     Arch has developed an integrated Compliance Management System ("Arch CMS") to

standardize and formalize practices and programs used to maintain, track, and improve environmental performance at all of its eastern operations. Under the terms of this Consent Decree, the Arch CMS will be implemented at all ICG Facilities. In addition, Defendants will implement the Arch CMS at all of the ICG Future Facilities. When complete and fully implemented, the Arch CMS will encompass Legal Requirements beyond the Applicable Law.

H.     Defendants Hawthorne Coal Co., Inc.; ICG Eastern, LLC; Juliana Mining Company, Inc.; King Knob Coal Company, Inc.; Patriot Mining Company, Inc.; Vindex Energy Corp.; and Wolf Run Mining Company have entered into the state settlements identified in Subparagraphs (i) through (ix) below, which resolve alleged NPDES permit violations other than those alleged in the Complaint in this action:

         i.     Consent Order M-08-012 between WVDEP and Hawthorne Coal Co., Inc., issued on May 19, 2008.

         ii.     Consent Order M-08-013 between WVDEP and ICG Eastern, LLC, issued on May 19, 2008.

         iii.     Consent Order M-08-014 between WVDEP and Juliana Mining Company, Inc., issued on May 19, 2008.

         iv.     Consent Order M-08-015 between WVDEP and King Knob Coal Company, Inc., issued on May 19, 2008.

         v.     Consent Order M-08-016 between WVDEP and Patriot Mining Company, Inc., issued on May 19, 2008.

         vi.     Consent Order M-08-017 between WVDEP and Vindex Energy Corp., issued on May 19, 2008.

3

vii.      Consent Order M-08-018 between WVDEP and Wolf Run Mining Company, issued on May 19, 2008.

viii.      Consent Decree between WVDEP and ICG Eastern, LLC, Civil Action No. 10-C-20, entered by the Circuit Court of Webster County, West Virginia on April 18, 2011, and Supplemental Consent Decree, entered on November 4, 2011.

ix.      Consent Decree between WVDEP and Hawthorne Coal Co., Inc., Civil Action No. 10-C-57, entered by the Circuit Court of Upshur County, West Virginia, on August 5, 2011.

Notwithstanding these settlements, all provisions of this Consent Decree shall apply to Hawthorne Coal Co., Inc.; ICG Eastern, LLC; Juliana Mining Company, Inc.; King Knob Coal Company, Inc.; Patriot Mining Company, Inc.; Vindex Energy Corp.; and Wolf Run Mining Company except as otherwise provided in Paragraph 77.

I.      On October 10, 2012, the Circuit Court of Franklin County, Kentucky entered a settlement between ICG East Kentucky, LLC; ICG Knott County, LLC; and Powell Mountain Energy, LLC (collectively referred to as the "ICG Kentucky Defendants"); ICG Hazard LLC; the Energy and Environment Cabinet of the Commonwealth of Kentucky; and certain Plaintiff Intervenors, which resolved the ICG Kentucky Defendant's and ICG Hazard LLC's NPDES alleged permit violations between January 1, 2008 and June 6, 2012. The ICG Kentucky Defendants are not subject to the requirements of Paragraphs 42-45 (Audits and Inspections), 50 (Audit Information), or 52 (Effluent Limit Violation Response), at Facilities located in Kentucky, except as otherwise provided by Paragraph 8. Notwithstanding, the United States reserves all rights and claims with respect to NPDES permit violations at the ICG Kentucky Defendants' operations in accordance with

4

Paragraphs 101 and 102.

      J.     On July 2, 2014, the Circuit Court of Upshur County, West Virginia entered a Consent Decree between WVDEP and Upshur Property, Inc. in Civil Action No. 13-C-13, which resolved alleged violations of NPDES Permit Nos. WV0050717, WV0067881, and WV0094901 from January 1, 2007 through December 31, 2013.  To avoid inconsistent injunctive relief, the provisions of this Consent Decree do not apply to Facilities associated with NPDES Permit Nos. WV0050717, WV0067881, and WV0094901 (the "Upshur Facilities"), except that Effluent Limit Violations at the Upshur Facilities must be reported under Paragraph 56(a) of the Consent Decree. Notwithstanding, the United States reserves all rights and claims with respect to NPDES permit violations at the Upshur Facilities in accordance with Paragraphs 101 and 102.

      K.     The Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation among the Parties, and that this Consent Decree is fair, reasonable, and in the public interest.

      NOW, THEREFORE, with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## II.  JURISDICTION AND VENUE

      1.     This Court has jurisdiction over the Parties and over the subject matter of this action, pursuant to 28 U.S.C. §§ 1331, 1345, 1355, and 1367, and Section 309(b) of the Clean Water Act, 33 U.S.C. § 1319(b).

      2.     The Parties agree that venue is proper in the Southern District of West Virginia pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1395(a), as well as Section 309(b) of the Clean Water Act, 33 U.S.C. § 1319(b).

5

3.      For purposes of this Decree, or any action to enforce this Decree, Defendants consent to the Court's jurisdiction over this Decree and consent to venue in this judicial district.

4.      For purposes of this Decree, Defendants agree that the Complaint states claims upon which relief may be granted pursuant to Sections 301 and 402 of the Act, 33 U.S.C. §§ 1311 and 1342, West Virginia Code § 22-11-1, *et seq.*, Virginia Code §§ 45.1-254 and § 62.1-44.2, *et seq.*, and Sections 301, 307, 315 and 601 of the PCSL, 35 P.S. §§ 691.301, 691.307, 691.315 and 691.601.

## III.      APPLICABILITY

5.      The provisions of this Consent Decree apply to and are binding upon the United States, the States, Defendants, and Defendants' successors and/or assigns, except as otherwise set forth herein.

6.      The provisions of this Consent Decree shall not apply to any ICG Future Facility that is otherwise required to comply with the Arch Decree.  The provisions of this Consent Decree shall apply to all other ICG Future Facilities as follows:

   a.      All provisions of the Decree shall apply to ICG Future Facilities that are located either (i) within the boundaries of existing Surface Mining Control and Reclamation Act ("SMCRA") or NPDES permits for Facilities covered by this Decree or by the Arch Decree, or (ii) adjacent to a Facility covered by this Decree or by the Arch Decree;

   b.      For all other ICG Future Facilities, the provisions of the Decree shall not apply, except that Defendants shall conduct Initial Treatment Systems Audits pursuant to Paragraph 42 as follows: (i) within 90 Days from the initiation of operations by Defendant(s) for Outlets with Persistent Noncompliance Issues; and (ii) within 120 Days from the initiation of operations by Defendant(s) for all remaining Outlets.

6

7.      The requirements in Paragraphs 34 through 41 (Arch Compliance Management System and CMS Audit), 33 (ICG Future Facilities), and 56(d) (Quarterly Reports) do not incorporate or otherwise apply to any portion of the Arch CMS that relates solely to Legal Requirements other than Applicable Law.

8.      Facilities located in Kentucky that are owned by, permitted to, or otherwise controlled by the ICG Kentucky Defendants are not subject to the requirements in Paragraphs 42-45 (Audits and Inspections), 50 (Audit Information), and 52 (Effluent Limit Violation Response) except with respect to Outlets that have Persistent Noncompliance Issues.  Once such an Outlet is subject to the requirements of Paragraphs 42-45, 50, and 52 due to Persistent Noncompliance Issues, that Outlet will continue to be subject to those Paragraphs until it has demonstrated 12 consecutive months of compliance with all applicable NPDES permit limits.

9.      Defendants hereby agree that they shall be bound to perform duties scheduled to occur by this Consent Decree prior to the Effective Date.  In the event the United States withdraws or withholds consent to this Consent Decree before entry, or the Court declines to enter this Consent Decree, then the preceding requirement to perform duties scheduled to occur before the Effective Date shall terminate.

10.     No transfer of ownership or operation of any Facility shall relieve Defendants of their obligations to ensure that the terms of the Decree are implemented, except as provided in Paragraphs 11-12 below.  At least 60 Days prior to any transfer of ownership or operation of a Facility, Defendants shall provide to the United States: (a) written notice of the prospective transfer; (b) certification that the Facility is in compliance with applicable terms of the Consent Decree and that the obligations under Paragraph 11(a) have been completed or will be completed regardless of

transfer; (c) a copy of all Database entries for the most recent audits conducted at the Facility under Paragraphs 42 (Initial Treatment System Audits), 44 (Internal Environmental Audits), and 45 (Third-Party Environmental Audits); and (d) a copy of all Database entries relating to Effluent Limit Violations during the preceding 12 months at any Outlets at the Facility to be transferred.  If the Facility to be transferred will remain subject to the terms of this Decree pursuant to Paragraph 11, Defendants shall provide a copy of this Consent Decree to the proposed transferee at least 30 Days prior to any transfer of ownership or operation of a Facility.  Any attempt to transfer ownership or operation of a Facility without complying with this Paragraph constitutes a violation of this Decree.

11.     Upon the lawful and legitimate sale of a Facility to an unaffiliated, bona fide purchaser, whether such sale is structured as a transfer of assets or purchase and sale of equity ownership, and upon compliance with Paragraph 10 above, neither the purchaser nor the Facility shall be subject to the terms of this Decree, and Defendants' remaining obligations under the Consent Decree for that particular Facility will terminate, subject to the following conditions:

a.      No transfer of ownership or operation of any Facility shall relieve Defendants of their obligations under Section V (Civil Penalty) or Paragraph 42 (Initial Treatment System Audits) of the Decree, nor shall it relieve Defendants of any obligations to implement alterations, maintenance, and/or corrective measures under Paragraph 44 (Internal Environmental Audits), 45 (Third-Party Environmental Audits), or 52 (Effluent Limit Violation Response), that have been identified with respect to that Facility at the time of the required notification to the United States of the proposed transfer; and

b.      Except as provided in Paragraph 12, no transfer of ownership or operation of any Facility shall relieve Defendants of their obligations under Paragraphs 43 (Outlet Inspections),

8

44 (Internal Environmental Audits), 45 (Third-Party Environmental Audits), 47 (Electronic Notification of DMR Sample Results), and 52 (Effluent Limit Violation Response) with respect to that Facility, where any Outlet at such Facility has Persistent Noncompliance Issues at the time of the required notification to the United States of the proposed transfer.

12.     Defendants may be relieved of their obligation to ensure that Paragraphs 43, 44, 45, 47, and 52 are implemented at a transferred Facility with Persistent Noncompliance Issues only if: (a) the transferee agrees to implement Paragraphs 43, 44, 45, 47, and 52 at the transferred Facility for the remainder of the Consent Decree term and to be substituted for the applicable Defendant(s) as a Party under the Decree with respect to those provisions, (b) the United States, after any necessary consultation with the States, consents to relieve the applicable Defendant(s) of its obligations, and (c) the transferee becomes a Party to this Consent Decree with respect to the transferred Facility, pursuant to Section XVII (Modification).  The United States' decision to refuse to approve the substitution of the transferee for the Defendant(s) shall not be subject to judicial review.  For any such transfer, the applicable Defendant shall provide a copy of the provisions of the proposed transfer agreement pertaining to the successor entity's assumption of responsibilities under this Consent Decree to the United States simultaneously with the notice required under Paragraph 10.

13.     Notwithstanding Paragraphs 11-12, the terms, conditions, and obligations of this Consent Decree shall survive any reorganization of Defendants' corporate structure and shall be fully binding on any entity or organization which is affiliated with Defendants as a result of any such reorganization of Defendants' corporate structure.  The terms, conditions, and obligations of this Consent Decree shall also be fully binding on any entity or organization that is subject to successor liability for Clean Water Act violations at the Facility.

9

14.   In any action to enforce this Consent Decree, Defendants shall not raise as a defense the failure by any of their officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

## IV.  DEFINITIONS

15.   Terms used in this Consent Decree that are defined in the Act or in regulations promulgated pursuant to the Act shall have the meanings assigned to them in the Act or such regulations, unless otherwise provided in this Decree.  Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

a.   "Applicable Law" shall mean (i) the Clean Water Act ("CWA"), West Virginia Water Pollution Control Act, Kentucky Revised Statutes § 224.70-110, *et seq.*, Virginia's State Water Control Law and Va. Code. § 45.1-254, the Pennsylvania Clean Streams Law, and Title 9 of the Maryland Environment Article, and (ii) the relevant SMCRA programs in each applicable state that relate to the operation, monitoring and/or maintenance of discharges, drainage and/or sediment control systems or that may impact water quality; and all associated regulations, guidance, and performance standards.

b.   "Arch" shall mean Arch Coal, Inc.

c.   "Arch Audit and Violations Database" or "Database" shall mean the database created to collect and maintain audit- and violations-related information pursuant to paragraphs 46 and 50-52 of the Arch Consent Decree.

d.   "Arch Compliance Management System" or "Arch CMS" refers to the integrated system created for Arch by the CMS Consultant and implemented pursuant to paragraph

10

31 of the Arch Consent Decree to standardize and formalize practices and programs used to maintain, track, and improve environmental performance.

> e.      "Arch Consent Decree" or "Arch CD" shall mean the Consent Decree entered in Civ. No. 2:11-cv-00133 by the Southern District of West Virginia on November 7, 2011.

> f.      "Audit Findings" shall mean a written summary of all instances of noncompliance with the CMS Manual noted during the CMS Audit conducted pursuant to Paragraph 37 of this Decree, and all areas of concern identified during the course of that audit which, in the CMS Auditor's judgment, merit further review or evaluation for potential CMS, environmental, or regulatory impacts.

> g.      "Audit Response and Action Plan" shall mean a comprehensive plan for bringing the ICG Facilities into full compliance with the CMS Manual and fully addressing all Audit Findings identified in the CMS Audit Report.

> h.      "Complaint" shall mean the complaint filed by the United States and the States in this action concurrent with the lodging of this Decree.

> i.      "CMS Audit" shall mean the audit conducted by the CMS Auditor pursuant to Paragraph 37 of this Consent Decree following the Audit Protocol attached as Appendix A to this Decree.

> j.      "CMS Auditor" shall mean the independent third-party previously approved by EPA pursuant to paragraphs 36-37 of the Arch Consent Decree, who shall conduct the CMS Audit pursuant to Paragraphs 36-38 of this Consent Decree.

> k.      "CMS Audit Report" shall mean the report developed by the CMS Auditor after completion of the CMS Audit pursuant to Paragraph 38 of this Consent Decree.

11

l.      "CMS Consultant" shall mean the independent third-party previously approved by EPA to implement the Arch CMS pursuant to the Arch Consent Decree, who shall perform the applicable duties set forth in Paragraph 34 of this Consent Decree.

m.      "CMS Manual" shall mean the document attached as Appendix B to the Arch Consent Decree and all subsequent amendments thereto, which describes and documents the integrated CMS developed for the Defendants and has been approved by EPA.

n.      "Consent Decree" or "Decree" shall mean this Decree and all appendices attached hereto (listed in Section XXIII).

o.      "Daily Violation" shall mean (i) any exceedance of a maximum daily discharge limitation, as determined under applicable state or federal law, for any parameters set forth in NPDES permits applicable to ICG Facilities, which is identified by a DMR Sample, or (ii) any failure to attain a minimum daily discharge limitation for pH set forth in NPDES permits applicable to ICG Facilities, as determined under applicable state or federal law, which is identified by a DMR Sample.

p.      "Day" shall mean a calendar day unless expressly stated to be a business day. In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the next business day, except as otherwise provided in Paragraph 64.

q.      "Defendants" shall mean Arch Coal, Inc.; Hawthorne Coal Co., Inc.; ICG Beckley, LLC; ICG East Kentucky, LLC; ICG Eastern, LLC; ICG Knott County, LLC; ICG Tygart Valley, LLC; Juliana Mining Company, Inc.; King Knob Coal Company, Inc.; Patriot Mining

12

Company, Inc.; Powell Mountain Energy, LLC; The Sycamore Group, LLC; Vindex Energy Corp.; White Wolf Energy, Inc.; and Wolf Run Mining Co.

    r.  "Diagnostic Sampling" shall mean sampling to determine necessary treatment measures and/or to evaluate the effectiveness of response actions taken. Such sampling of discharges need not occur at the location designated for required sampling pursuant to the respective permit or be taken in accordance with approved test procedures under 40 C.F.R. Part 136.

    s.  "Discharge Monitoring Report Sample" or "DMR Sample" shall mean a sample taken in accordance with approved test procedures under 40 C.F.R. Part 136.

    t.  "Effective Date" shall be the date upon which this Consent Decree is entered by the Court or a motion to enter this Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

    u.  "Effluent Limit Violation" shall mean a Daily Violation or a Monthly Violation.

    v.  "Environmental Operating Procedures" or "EOPs" shall mean the ICG Facility-specific CMS documents relating to the Applicable Law which describe and document the procedures for implementation of the integrated CMS at the ICG Facilities.

    w.  "EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies.

    x.  "ICG Defendants" shall mean Hawthorne Coal Co., Inc.; ICG Beckley, LLC; ICG East Kentucky, LLC; ICG Eastern, LLC; ICG Knott County, LLC; ICG Tygart Valley, LLC; Juliana Mining Company, Inc.; King Knob Coal Company, Inc.; Patriot Mining Company, Inc.;

13

Powell Mountain Energy, LLC; The Sycamore Group, LLC; Vindex Energy Corp.; White Wolf Energy, Inc.; and Wolf Run Mining Co.

      y.    "ICG Facility" or "Facility" shall mean mining operations (including but not limited to, surface and underground mines, coal processing and preparation plants, coal transportation facilities, Post-Mining Areas, and all associated operations) that are owned, permitted, or otherwise controlled by ICG Defendants or their direct or indirect subsidiaries.

      z.    "ICG Future Facilities" shall mean ICG Facilities that are not acquired, permitted, or otherwise controlled by ICG Defendants or their direct or indirect subsidiaries until after the date of lodging of the Consent Decree.

      aa.    "ICG Kentucky Defendants" shall mean ICG East Kentucky, LLC; ICG Knott County, LLC; and Powell Mountain Energy, LLC.

      bb.    "Legal Requirements" shall mean the federal statutes identified under Section 2.2.2.1 of the CMS Manual.

      cc.    "Monthly Violation" shall mean any exceedance, as determined by a DMR Sample, of an average monthly discharge limitation for any parameters set forth in NPDES permits applicable to ICG Facilities.

      dd.    "NOVs" shall mean, for violations or any noncompliance that may impact water quality, notices of violation under the West Virginia Surface Coal Mining and Reclamation Act, W.Va. Code § 22-3-17 (2004), notices of noncompliance under the Kentucky Surface Mining Act, Ky. Rev. Stat. § 350.130 (Michie 2004), notices of violation under the Virginia Coal Surface Mining Control and Reclamation Act, Va. Code § 45.1-245, notices of violation under Pennsylvania

Surface Mining Control and Reclamation Act, 52 P.S. §§ 1396.1-1396.31, and/or notices of violation under Title 15 of the Maryland Environment Article.

        ee.    "NPDES" shall mean the National Pollutant Discharge Elimination System defined in 40 C.F.R. § 122.2 and any state-issued NPDES permit.

        ff.    "Outlet" shall mean an NPDES permitted discharge point, but shall not include any discharge point permitted in advance of construction where such discharge point has never been constructed.

        gg.    "Paragraph" shall mean a portion of this Decree identified by an Arabic numeral.

        hh.    "Parties" shall mean the United States, the States, and Defendants.

        ii.    "Persistent Noncompliance Issues" or "Persistent Noncompliance" shall mean four or more Effluent Limit Violations of a given parameter at an Outlet within the preceding 12 consecutive-month period.

        jj.    "Post-Mining Areas" shall mean ICG Facilities that meet the definition of 40 C.F.R. § 434.11(k).

        kk.    "Section" shall mean a portion of this Decree identified by a Roman numeral.

        ll.    "States" shall mean the State of West Virginia, the Commonwealth of Virginia, and the Commonwealth of Pennsylvania, Department of Environmental Protection.

        mm.    "United States" shall mean the United States of America, acting on behalf of EPA.

## V.  **CIVIL PENALTY**

    16.    Within 30 Days after the Effective Date of this Consent Decree, Defendants shall pay

a total of $2,000,000 as a civil penalty to the United States and the States.

17.     $1,000,000 of the civil penalty shall be paid to the United States, $895,000 of the civil penalty shall be paid to the State of West Virginia, $20,000 of the civil penalty shall be paid to the Commonwealth of Virginia, and $85,000 of the civil penalty shall be paid to the Commonwealth of Pennsylvania.

18.     Defendants shall make payments to the United States at https://www.pay.gov to the U.S. Department of Justice account, in accordance with instructions provided to Defendants by the Financial Litigation Unit ("FLU") of the United States Attorney's Office for the Southern District of West Virginia after the Effective Date.  The payment instructions provided by the FLU shall include a Consolidated Debt Collection System ("CDCS") number, which Defendants shall use to identify all payments required to be made in accordance with this Consent Decree.  The FLU will provide the payment instructions to:

>       Barkley J. Sturgill, Jr.
>       Assistant General Counsel
>       Arch Coal, Inc.
>       One CityPlace Drive, Ste. 300
>       St. Louis, MO 63141
>       (314) 994-2992 (office)
>       (314) 994-2734 (fax)
>       bsturgill@archcoal.com

on behalf of Defendants.  Defendants may change the individual to receive payment instructions on their behalf by providing written notice of such change to the United States in accordance with Section XV (Notices).  At the time of payment, Defendants shall send notice that payment has been made: (i) to EPA via email at acctsreceivable.cinwd@epa.gov or via regular mail at EPA Cincinnati Finance Office, 26 Martin Luther King Drive, Cincinnati, Ohio, 45268; and (ii) to the United States via email or regular mail in accordance with Section XV.  Such notice shall reference the CDCS

Number and DOJ case number, 90-5-1-1-09476/3.

19.     Defendants shall make payment to the State of West Virginia under this Section by certified or cashier's check to the WVDEP for deposit in the WVDEP's Mining and Reclamation Operations Fund.  Payments shall be mailed to:

> Assistant Director, Inspection and Enforcement
> Division of Mining and Reclamation
> West Virginia Department of Environmental Protection
> 601 57th Street, SE
> Charleston, WV 25304

20.     Defendants shall make payment to the Commonwealth of Virginia under this Section by certified or cashier's check made payable to the "Treasurer of Virginia."  Payment shall be mailed to: Hearings and Legal Services Officer; Department of Mines, Minerals and Energy, Division of Mined Land Reclamation; P. O. Drawer 900; Big Stone Gap, Virginia 24219.

21.     Defendants shall make payment to the Commonwealth of Pennsylvania under this Section by certified or cashier's check made payable to the Commonwealth of Pennsylvania, Clean Water Fund and mailed to:

> Deputy Secretary
> Active and Abandoned Mining Operations
> Pa. Department of Environmental Protection
> Rachel Carson State Office Building
> 400 Market Street, 16th Floor
> Harrisburg, PA 17101

22.     Defendants shall not deduct any penalties paid under this Decree pursuant to this Section or Section IX (Stipulated Penalties) in calculating their federal, state, or local income tax.

## VI.  COMPLIANCE REQUIREMENTS

23.     This Consent Decree in no way affects or relieves Defendants of their responsibility to

comply with applicable federal, state, and local laws, regulations, and permits.

24.     Defendants shall perform the work required by this Consent Decree in compliance with the requirements of all applicable federal, state, and local laws, regulations, and permits.  This Consent Decree shall not be considered as a permit issued pursuant to any federal, state, or local statute or regulation.

25.     <u>Approval of Deliverables</u>.  After review of any plan, report, or other item that is required to be submitted and approved pursuant to this Consent Decree, EPA, after consultation with the States, shall in writing: (a) approve the submission; (b) approve the submission with specified conditions; (c) approve part of the submission and disapprove the remainder; or (d) disapprove the submission.

26.     If the submission is approved pursuant to Paragraph 25(a), Defendants shall take all actions required by the plan, report, or other document, in accordance with the schedules and requirements of the plan, report, or other document, as approved.  If the submission is conditionally approved or approved only in part, pursuant to Paragraph 25(b) or 25(c), Defendants shall, upon written direction from EPA, after consultation with the States, take those actions required by the approved plan, report, or other item that EPA, after consultation with the States, determines are technically severable from any disapproved portions, subject to Defendants' right to dispute the specified conditions or EPA's disapproval of the disapproved portions, under Section XI of this Decree (Dispute Resolution).

27.     If the submission is disapproved in whole or in part pursuant to Paragraph 25(c) or (d), Defendants shall, within 45 Days of receipt of disapproval or within such other timeframe or upon such other schedule as the Parties agree to in writing, correct all deficiencies and resubmit the

18

plan, report, or other item, or disapproved portion thereof, for approval, in accordance with the preceding Paragraphs. If the resubmission is approved in whole or in part, Defendants shall proceed in accordance with the preceding Paragraph.

28.     Any stipulated penalties applicable to the original submission, as provided in Section IX of this Decree (Stipulated Penalties), shall accrue during the 45-Day period or other specified period, but shall not be payable unless the resubmission is untimely or is materially disapproved in whole or in part; provided that, if the original submission was so deficient as to constitute a material breach of Defendants' obligations under this Decree, the stipulated penalties applicable to the original submission shall be due and payable notwithstanding any subsequent resubmission.

29.     If a resubmitted plan, report, or other item, or portion thereof, is disapproved in whole or in part, EPA, after consultation with the States, may again require Defendants to correct any deficiencies, in accordance with the preceding Paragraphs, subject to Defendants' right to invoke Dispute Resolution under Section XI and the right of EPA to seek stipulated penalties as provided in the preceding Paragraph.

30.     Permits. Where any compliance obligation under this Section requires Defendants to obtain a federal, state, or local permit or approval, Defendants shall submit timely and substantially complete applications and take all other actions necessary to obtain all such permits or approvals. Defendants may seek relief under the provisions of Section X of this Consent Decree (Force Majeure) for any delay in the performance of any such obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if Defendants have submitted timely and substantially complete applications and have taken all other actions necessary to obtain all such permits or approvals.

31.      Within 60 Days of the date of lodging of this Consent Decree, Defendants shall revise the EOPs, or create new work practices or the equivalent, to include specific procedures for implementing the requirements of this Consent Decree at the ICG Facilities, including but not limited to (a) protocols for Outlet Inspections, Internal Environmental Audits, and Third-Party Environmental Audits pursuant to Paragraphs 43-45, (b) protocols for implementation and maintenance of the Arch Audit and Violations Database pursuant to Paragraphs 46-50, (c) protocols for all contractors with responsibilities under this Decree to comply with the terms of this Decree, and (d) specifications for the annual training required by Paragraphs 53-55.

32.      Defendants shall make copies of the Decree and the revised EOPs available to all officers, employees, and agents whose duties might reasonably include compliance with any provision of this Decree. Defendants shall also provide copies of relevant protocols to contractors with responsibilities under this Decree. Defendants shall condition any contract for the performance of work required under this Consent Decree upon performance of the work in conformity with the terms of the Decree.

33.      ICG Future Facilities. For ICG Future Facilities subject to this Decree pursuant to Paragraph 6, Defendant(s)' obligation to comply with the requirements for Outlet Inspections, implementation of the Arch Audit and Violations Database, electronic notification of violations, and Effluent Limit Violation Response pursuant to Paragraphs 43 and 46-52 of this Consent Decree shall begin 60 Days from the initiation of operations by Defendant(s). Defendant(s) shall conduct an Initial Treatment System Audit pursuant to Paragraph 42 at Future Facilities within 60 Days from the initiation of operations by Defendant(s) for Outlets with Persistent Noncompliance Issues, and within 90 Days from the initiation of operations by Defendant(s) for all other Outlets. All alterations and/or

maintenance measures identified by the Initial Treatment System Audits must be completed within 150 Days from the initiation of operations by Defendant(s).  Defendant(s)' obligation to comply with Reporting Requirements, Internal Audits, Third-Party Audits, and training requirements pursuant to Section VIII and Paragraphs 44-45 and 53-55 with respect to ICG Future Facilities shall begin the second quarter after the initiation of operations by Defendant(s).  Defendant(s) shall implement the Arch CMS at ICG Future Facilities within 9 months of the initiation of operations by Defendant(s).

## VII.  INJUNCTIVE RELIEF

### Implementation of Arch Compliance Management System

34.     Within 60 Days of the date of lodging of this Consent Decree Defendants shall implement the Arch CMS at the ICG Facilities.  Implementation shall be conducted at each Facility by an individual with a minimum of five years' experience in implementing and developing CMS documentation and procedures.  Defendants shall also seek the assistance of the CMS Consultant as necessary to ensure adequate implementation, and shall bear all costs associated with the CMS Consultant, cooperate fully with the CMS Consultant, and provide the CMS Consultant with access to all records, employees, contractors, and ICG Facilities that the CMS Consultant deems reasonably necessary to effectively perform the CMS Consultant's duties.

35.     Certificate of Conformance.  Managers responsible for environmental compliance at each ICG Facility (e.g. Engineering Manager or individual functioning in an equivalent capacity) shall include a certification of material conformance with the CMS Manual in quarterly reports to the Corporate Director of Environmental Affairs of Arch Coal, Inc. pursuant to Paragraph 56, or, for any material nonconformance, shall submit in the quarterly reports an explanation of the cause of the nonconformance, remedial steps to be taken, and a date for achieving conformance.

**CMS Audit**

36.     Within 12 months of implementing the Arch CMS at the ICG Facilities pursuant to Paragraph 34, Defendants shall commence a CMS Audit pursuant to Paragraph 37 using the CMS Auditor.  Defendants shall bear all costs associated with the CMS Auditor, cooperate fully with the CMS Auditor, and provide the CMS Auditor with access to all records, employees, contractors, and ICG Facilities that the CMS Auditor deems reasonably necessary to effectively perform the duties described in Paragraphs 37-38.  Defendants may choose to have the CMS Consultant present during the third-party CMS Audit and shall also bear all costs associated with the CMS Consultant. Defendants shall complete the CMS Audit within 90 Days of commencement pursuant to this Paragraph.

37.     The CMS Audit conducted by the CMS Auditor shall include an evaluation of the adequacy of CMS implementation at the ICG Facilities relative to the CMS Manual, and identification of areas of concern, from top management down, throughout each major organizational unit with responsibilities under the CMS Manual.  The CMS Audit shall be conducted in accordance with Appendix A, and shall determine the following:

        a.     To what extent the system, subsystem, program, or task has been implemented, and is being maintained;

        b.     The adequacy of each ICG Facility's internal self-assessment procedures for programs and tasks composing the CMS;

        c.     Whether ICG Defendants are effectively communicating Applicable Law requirements to affected parts of the organization, or those working on behalf of the organization; and

d.    Whether there are deviations from written requirements or procedures applicable to the ICG Defendants.

38.    Within 45 Days following the completion of the CMS Audit, the CMS Auditor shall develop and submit a CMS Audit Report to Defendants.  Within 60 Days following completion of the CMS Audit, the CMS Auditor shall submit the CMS Audit Report to EPA and the States.  The CMS Audit Report shall contain: (a) a summary of the audit process, including any obstacles encountered; (b) detailed Audit Findings, including the basis for each finding and each area of concern identified; (c) identification of any Audit Findings corrected or areas of concern addressed during the audit; and (d) certification that the CMS Audit was conducted in accordance with the provisions of this Decree.

39.    Follow-Up Corrective Measures.  Within 60 Days of receiving the CMS Audit Report, Defendants shall submit to EPA and the States for review and approval a report responding to the Audit Findings and areas of concern identified in the CMS Audit Report, and providing an action plan for expeditiously coming into full conformance with the CMS Manual (the "Audit Response and Action Plan").

a.    The Audit Response and Action Plan shall be developed in consultation with the CMS Consultant, and shall include the CMS Consultant's recommendations as to (i) whether further improvements should be made to the CMS, CMS Manual, and/or EOPs; and (ii) how to resolve any area of concern or otherwise achieve full implementation of the CMS Manual.

b.    The Audit Response and Action Plan shall include the result of any investigations, specific deliverables, responsibility assignments, and an implementation schedule for the identified actions and measures, including those that may have already been completed.

23

40.    EPA, after consultation with the States, will provide comments on the Audit Response and Action Plan and Defendants shall, within 30 Days of receipt of EPA's comments on the Audit Response and Action Plan, submit to EPA a Final Audit Response and Action Plan responding to and addressing EPA's comments.

41.    After making any necessary modifications to the Audit Response and Action Plan based on EPA comments, if any, Defendants shall implement the Final Audit Response and Action Plan in accordance with the schedules set forth therein.

### Audits and Inspections

42.    <u>Initial Treatment Systems Audits</u>. Defendants shall conduct an audit of the treatment systems for each Outlet to determine whether the treatment systems in place are adequate to maintain compliance with the Applicable Law at the ICG Facilities.

a.    The Initial Treatment Systems Audits shall be conducted according to the following schedule:

(i)    Within 60 Days of lodging of this Consent Decree, Defendants shall audit all Outlets with Persistent Noncompliance Issues;

(ii)    Within 90 Days of lodging of this Consent Decree, Defendants shall audit all remaining Outlets.

b.    Initial Treatment System Audits under Paragraph 42(a)(i) shall be conducted by a third-party consultant with at least five years of experience with the requirements of NPDES and SMCRA permits and with treatment systems for and control of relevant effluent parameters in Defendants' NPDES permits.  Initial Treatment System Audits under Paragraph 42(a)(ii) shall be conducted by an individual with experience with the requirements of NPDES and SMCRA permits

24

and with treatment systems for and control of relevant effluent parameters in Defendants' NPDES permits, who does not have daily responsibilities at the Facility where the Initial Treatment System Audit is to be conducted.

        c.     Based on the results of the audits, Defendants shall identify for each Outlet any alterations to and/or maintenance measures for its associated treatment systems that must be taken to achieve and maintain compliance with the Applicable Law and a schedule for such alterations and/or maintenance measures.

        d.     All alterations and/or maintenance measures identified by the Initial Treatment System Audits must be completed within 120 Days of the date of lodging of this Consent Decree for Outlets with Persistent Noncompliance issues and 150 Days of the date of lodging for all remaining Outlets.

        43.     <u>Outlet Inspections</u>. Starting with the first full month after the lodging of this Consent Decree, Defendants shall conduct Outlet Inspections at the ICG Facilities at least twice a month, at the time of DMR Sampling. Outlet Inspections shall be conducted pursuant to an Outlet Inspection Checklist created by Defendants, which shall include entries for whether: (a) the Outlet is accessible; (b) the Outlet is unobstructed; (c) discharge markers are visible at Outlets in West Virginia; (d) there is any water flow at the Outlet; (e) there are any visual indications of overtopping of the pond or sediment ditch cell associated with each Outlet; (f) there is erosion or other damage evident jeopardizing the integrity of the embankment of the structure at each Outlet; (g) baffles and retention curtains, if any, are in place; (h) chemical treatment systems, if any, are operational; and (i) chemical treatment valves are appropriately secured. The Outlet Inspection Checklist shall be completed at the time of each Outlet Inspection, shall indicate the date and time of completion, and shall be signed by

the individual completing the Outlet Inspection.  These inspections shall be conducted by qualified personnel, technicians that collect samples for the independent commercial laboratories, or consultants.

44.   Internal Environmental Audits.  Defendants shall conduct Internal Environmental Audits at each ICG Facility, which shall be conducted under the direction or supervision of an environmental professional with at least five years experience with the requirements of the Applicable Law.

a.   The Internal Environmental Audits shall include, but need not be limited to: (i) a treatment system audit pursuant to the requirements of Paragraph 42, (ii) inspections to assess the structural integrity of all slurry pipes, and (iii) an evaluation of compliance with the applicable regulations for drainage and sediment control.

b.   Internal Environmental Audits shall be conducted at each Post-Mining Area on an annual basis, and shall include all elements of Paragraph 44(a), as applicable.

c.   For all other ICG Facilities, Internal Environmental Audits shall be conducted according to the following schedule:

(i)   Treatment system audits under Paragraph 44(a)(i) shall be conducted at ICG Facilities with Outlets that have Persistent Noncompliance Issues on a quarterly basis and shall be conducted at the remaining Outlets on a semi-annual basis.

(ii)   Visual inspections of all slurry pipes shall be conducted on a semi-annual basis, and inspections to assess the structural integrity of all slurry pipes shall be conducted on an annual basis.

(iii)   Compliance audits under Paragraph 44(a)(iii) shall be conducted on a

26

semi-annual basis.

45.     Third-Party Environmental Audits.     Defendants shall conduct Third-Party Environmental Audits annually at each ICG Facility.  Audits under this Paragraph shall evaluate compliance with this Consent Decree and with the Applicable Law.

**Arch Audit and Violations Database**

46.     Within 60 Days of lodging of the Consent Decree, Defendants shall integrate ICG Facilities into the Arch Audit and Violations Database.  The integration process shall include uploading the following information for each Effluent Limit Violation at each Outlet beginning on January 1, 2011 into the Database:

    a.     Identification of Outlet by NPDES and SMCRA permit numbers, permittee, and latitude and longitude;

    b.     Dates of DMR Samples and DMR Sample results;

    c.     NPDES effluent limit that was exceeded;

    d.     Percentage by which the limit was exceeded;

    e.     Number of Effluent Limit Violations in a row for the same parameter;

    f.     Number of Effluent Limit Violations for that particular parameter over the preceding 12 months; and

    g.     Total number of Effluent Limit Violations at that particular Outlet over the preceding 12 months.

47.     Electronic Notification of DMR Sample Results.  Upon integration pursuant to Paragraph 46, Defendants shall require laboratories to provide electronic transmittal of all DMR Sample results to the Database within 48 hours of completion of analysis.  Upon receipt of DMR

Sample results, Defendants shall provide immediate electronic notification of Effluent Limit Violations to managers responsible for environmental compliance at the relevant Facilities. The electronic notification shall identify the Outlet, the relevant DMR Sample result(s), and date when the violation occurred. Defendants shall also submit DMR Sample results electronically to the relevant regulatory authority if that regulatory authority has the capability to receive DMRs electronically via a Cross Media Electronic Reporting Regulation ("CROMERR") compliant electronic reporting system.

48.     <u>Violations</u>. Within three business days of receipt of DMR Sample results pursuant to Paragraph 47, Defendants shall update the Database to include the information identified in Subparagraphs 46(a)-46(g) and any applicable stipulated penalties for each Effluent Limit Violation. In addition, Defendants shall update the Database to include the following information for each Effluent Limit Violation as soon as possible:

a.     A description of the cause of the Effluent Limit Violation and the planned response to the Effluent Limit Violation, taking into account any applicable audit information and any required actions under Paragraph 52 (Effluent Limit Violation Response); and

b.     Date that Effluent Limit Violation ended (if applicable).

49.     The Database shall also include entries for Applicable Law violations other than Effluent Limit Violations that occur subsequent to the integration of the Database pursuant to Paragraph 46, including NOVs or unauthorized discharges, along with the following information:

a.     Permit number;

b.     Description of violation;

c.     Date of violation;

    d.  Cause of violation and planned response, taking into account any applicable information in the Audit Database; and

    e.  Date that noncompliance ended (if applicable).

  50.  <u>Audit Information</u>.  Upon integration pursuant to Paragraph 46, the results of each audit and inspection conducted pursuant to Paragraphs 42-45 shall be entered into the Database within 3 business days of completion.  The Database shall include the following for each audit and inspection conducted at an ICG Facility: (a) the date of the audit/inspection; (b) the names of the individuals conducting the audit/inspection; (c) a description of any noncompliance or other areas of concern; (d) the applicable permit number and Outlet; and (e) the planned response to any noncompliance or areas of concern, the individuals responsible for the response, the deadline for the response, and the date of completion of the response.  Responses to a noncompliance or other problem identified by an audit or inspection conducted pursuant to Paragraphs 42-45 shall be completed as expeditiously as possible, and shall not take longer than 45 Days to complete, unless an extension of time is granted by EPA in writing.  Responses that are not completed by the deadline initially assigned in the Database shall be reported to the Corporate Director of Environmental Affairs of Arch Coal, Inc. as part of the quarterly report identified in Paragraph 56.

  51.  Defendants shall provide access to the Database to EPA and the States upon request. In addition, Defendants shall produce any requested information from the Database to EPA and the States within 14 Days of the request.

<b>Effluent Limit Violation Response</b>

  52.  Within 60 Days of lodging of this Consent Decree, Defendants shall implement a response plan for Effluent Limit Violations, which shall provide for investigation of Effluent Limit

29

Violations and implementation of actions necessary to achieve compliance with the applicable NPDES permit limits.  This response plan shall, at a minimum, provide for the following response actions at all Outlets in addition to the requirements of Paragraph 48:

   a.    Daily Violation Response

   (i)    Category 1 Daily Violation.  Upon notification of the first Daily Violation at any Outlet, Defendants shall conduct daily monitoring and implement treatment measures until the Outlet returns to compliance (i.e., until one compliant DMR Sample result is achieved).  Defendants shall also conduct a root cause analysis of the violation, including Diagnostic Sampling as necessary, and implement appropriate preventive measures to address the identified cause of the violation.  Any sample taken within 48 hours of notification of the first Daily Violation that results in a Daily Violation for the same pollutant parameter at the same Outlet is a Category 1 Daily Violation.

   (ii)    Category 2 Daily Violation.  Any sample taken after 48 hours of notification of the first Daily Violation that results in a Daily Violation for the same pollutant parameter at the same Outlet and is not subject to Paragraph 52(a)(iii) is a Category 2 Daily Violation.  Upon notification of the first Category 2 Daily Violation, Defendants shall consult with an individual with substantial expertise in Clean Water Act compliance and in treatment systems for and control of relevant effluent parameters in Defendants' NPDES permits.  That individual shall evaluate Defendants' root cause analysis and conduct any further analysis necessary to identify the cause of the violations, including Diagnostic Sampling as necessary, and recommend appropriate preventive and treatment measures.  Defendants shall implement the recommended preventive and treatment measures and shall continue daily monitoring until the Outlet returns to compliance (i.e.,

30

until one compliant DMR Sample result is achieved).

(iii)    Category 3 Daily Violation.  Any sample taken after 48 hours of notification of the first Category 2 Daily Violation that results in a Daily Violation for the same pollutant parameter at the same Outlet is a Category 3 Daily Violation.  Upon notification of the first Category 3 Daily Violation, Defendants shall hire a third-party consultant to examine the problem. Defendants shall continue daily monitoring and treatment of discharges until the Outlet returns to compliance (i.e., until one compliant DMR Sample result is achieved), unless the consultant determines that daily monitoring and treatment will not assist in examining and/or resolving the noncompliance.  The consultant shall prepare a report detailing the cause of the continuing violations and a plan to address the continuing violations, including the appropriate frequency of monitoring and sampling.  Within 30 Days of receipt of the report, Defendants shall either: (1) implement the proposed plan according to the consultant's recommendations, or (2) prepare and implement an alternative plan to address the continuing violations, taking into consideration the consultant's findings as to the cause of the continuing violations and the appropriate frequency of monitoring and sampling.

(iv)    If Defendants implement an alternative plan to the consultant's recommendations under Paragraph 52(a)(iii), stipulated penalties of $10,000 shall accrue for each subsequent Category 3 Daily Violation.

b.    Monthly Violation Response

(i)    Category 1 Monthly Violation.  Upon notification of the first Monthly Violation of a pollutant parameter at any Outlet ("Category 1 Monthly Violation"), Defendants shall conduct monitoring and treatment as appropriate until the Outlet returns to compliance (i.e., until the

Outlet meets the monthly average effluent limit). Defendants shall also conduct a root cause analysis of the violation, including Diagnostic Sampling as necessary, and implement appropriate preventive measures to address the identified cause of the violation.

(ii)     Category 2 Monthly Violation.   Upon notification of the second Monthly Violation in a row of the same pollutant parameter at the same Outlet ("Category 2 Monthly Violation"), Defendants shall consult with an individual with substantial expertise in Clean Water Act compliance and in treatment systems for and control of relevant effluent parameters in Defendants' NPDES permits.   That individual shall evaluate Defendants' root cause analysis and conduct any further analysis necessary to identify the cause of the violations, including Diagnostic Sampling as necessary, and recommend appropriate preventive and treatment measures.  Defendants shall implement the recommended preventive and treatment measures and shall continue daily monitoring until the Outlet returns to compliance (i.e., until the Outlet meets the monthly average effluent limit).

(iii)     Category 3 Monthly Violation.  Upon notification of the third and any subsequent Monthly Violation in a row of the same pollutant parameter at the same Outlet ("Category 3 Monthly Violation"), Defendants shall hire a third-party consultant to examine the problem.  Defendants shall continue daily monitoring and treatment of discharges until the Outlet returns to compliance (i.e., until the Outlet meets the monthly average effluent limit), unless the consultant determines that daily monitoring and treatment will not assist in examining and/or resolving the noncompliance.  The consultant shall prepare a report detailing the cause of the continuing violations and a plan to address the continuing violations, including the appropriate frequency of monitoring and sampling.  Within 30 Days of receipt of the report, Defendants shall

either (i) implement the proposed plan according to the consultant's recommendations, or (ii) prepare and implement an alternative plan to address the continuing violations, taking into consideration the consultant's findings as to the cause of the continuing violations and the appropriate frequency of monitoring and sampling.

(iv)    If Defendants implement an alternative plan to the consultant's recommendations under Paragraph 52(b)(iii), stipulated penalties of $20,000 shall accrue for each subsequent Category 3 Monthly Violation.

c.    If an Outlet is subject to Paragraph 52(a) and/or 52(b) for the same pollutant parameter five separate times within the preceding 12-month period, then Defendants shall comply with the response actions identified in Paragraph 52(a)(iii) or 52(b)(iii).

d.    During a violation response sequence pursuant to this Paragraph, if the Outlet does not discharge due to no flow conditions on four consecutive days, daily monitoring and treatment pursuant to this Paragraph may be suspended.  Any treatment system modification, root cause analysis, or expert consultation in progress must continue as scheduled.  If an Effluent Limit Violation occurs during the next sampling event for that Outlet, the violation response sequence resumes as if there were no suspension of daily monitoring and treatment.

### Training

53.    Defendants shall provide and require annual formal training for all individuals with environmental management responsibilities at the ICG Facilities including, but not limited to: (a) Clean Water Act compliance, including sediment control technologies; (b) requirements in the CMS Manual and EOPs relating to the Applicable Law; and (c) obligations in this Consent Decree.

54.    Defendants shall provide and require appropriate annual training for all individuals,

including all independent contractors, responsible for carrying out activities pursuant to this Consent Decree and/or any relevant requirements relating to the Applicable Law in the CMS Manual and EOPs at the ICG Facilities.

55.     All training under Paragraphs 53 and 54 shall be documented with the date of training, signatures of attendees, a summary of training topics, and copies of training materials.  Such documentation shall be included in the next quarterly report following the training session(s).

## VIII.   REPORTING REQUIREMENTS

### Quarterly Reports

56.     The Engineering Manager, or individual operating in an equivalent capacity, for each ICG Facility shall submit quarterly reports to the Corporate Director of Environmental Affairs of Arch Coal, Inc., the United States, and the States.  The quarterly reports may be submitted in electronic form and shall be due at the end of the month following the end of each quarter (i.e. by April 30, July 31, October 31, and January 31), starting with the first full quarter after the Effective Date, and may be combined with the quarterly reports submitted by Arch pursuant to the Arch CD. The quarterly reports shall contain, at a minimum, the following:

a.     Information regarding any CWA violation, including (i) a summary of Effluent Limit Violations at the Facility, including total number of Effluent Limit Violations, total number of Outlets with two or more Effluent Limit Violations in a row of the same parameter, total number of Outlets with Persistent Noncompliance Issues, and total amount of stipulated penalties paid during that quarter; (ii) a summary of any additional CWA violations, including NOVs or unauthorized discharges; (iii) a summary of steps taken or planned steps to remedy the violations identified in (i) and (ii); (iv) a copy of all violations entries in the Database for the relevant quarter;

34

and (v) if applicable, proof of payment of stipulated penalty under a state consent decree or consent order pursuant to Paragraph 77.

        b.      A summary of any instances in which an audit response was not completed by the deadline initially assigned in the Arch Audit and Violations Database;

        c.      Documentation of training sessions pursuant to Paragraph 55;

        d.      A certification of material conformance with the elements of the approved CMS Manual and the EOPs relating to the Applicable Law, or, for any material nonconformance, an explanation of the cause of the nonconformance and remedial steps taken or to be taken;

        e.      A copy of any consultant reports generated pursuant to Paragraph 52 during the previous quarter, and any documentation of actions taken in response to the report(s);

        f.      A list of NPDES permitted discharge points excluded from the definition of Outlet, and certification that those discharge points have not been constructed since the last report;

        g.      The status of Consent Decree implementation, including the status of any construction or compliance measures, and problems encountered or anticipated, together with implemented or proposed solutions;

        h.      A description of any noncompliance with the requirements of this Consent Decree and an explanation of the noncompliance's likely cause and the remedial steps taken, or to be taken, to prevent or minimize such noncompliance; and

        i.      A description of each Decree violation for which Defendants have submitted to EPA an unresolved Force Majeure claim or intend to submit a Force Majeure claim pursuant to Section X of this Consent Decree.

35

**Other Reporting Requirements**

57.     If Defendants violate, or have reason to believe that they may violate, any requirement of this Consent Decree, Defendants shall notify the United States and the States of such violation and its likely duration, in writing, within 7 Days of the day Defendants first become aware of the violation, with an explanation of the violation's likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such violation.  If the cause of a violation cannot be fully explained at the time the report is due, Defendants shall so state in the report.  Defendants shall investigate the cause of the violation and shall then submit an amendment to the report, including a full explanation of the cause of the violation, within 30 Days of the day Defendants become aware of the cause of the violation.  Nothing in this Paragraph or the following Paragraph relieves Defendants of their obligation to provide the notice required by Section X of this Consent Decree (Force Majeure).

58.     Whenever any violation of this Consent Decree or of any applicable permit or any other event affecting Defendants' performance under this Decree, or the performance of the ICG Facilities, may pose an immediate threat to the public health or welfare or the environment, Defendants shall notify EPA and the States orally or by electronic or facsimile transmission as soon as possible, but no later than 24 hours after Defendants first knew of the violation or event.  This procedure is in addition to the requirements set forth in the preceding Paragraph.

59.     All reports shall be submitted to the persons designated in Section XV of this Consent Decree (Notices).

60.     Each report submitted by Defendants under this Section shall be signed by an official of the submitting party and include the following certification:

> I certify under penalty of law that this document and all attachments
> were prepared under my direction or supervision in accordance with a

> system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

This certification requirement does not apply to emergency or similar notifications where compliance would be impractical.

61.     The reporting requirements of this Consent Decree do not relieve Defendants of any reporting obligation required by the Act or implementing regulations, or by any other federal, state, or local law, regulation, permit, or other requirement.

62.     Any information provided pursuant to this Consent Decree may be used by the United States or any of the States in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.

## IX.  STIPULATED PENALTIES

63.     Defendants shall be liable for stipulated penalties to the United States and the States for violations as specified below, unless excused under Section X (Force Majeure). A violation includes failing to perform any obligation required by the terms of this Decree, including any work plan or schedule approved under this Consent Decree, according to all applicable requirements of this Decree and within the specified time schedules established by or approved under this Consent Decree.

64.     Stipulated penalties under this Section shall begin to accrue on the Day after performance is due or on the Day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases. If performance is

37

satisfactorily completed, or if a violation ceases on a Saturday, Sunday, or federal holiday, the date of completion of performance and the date that the violation ceases shall be considered to be the date of actual completion or cessation, rather than the following business day.  Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

65.  Any Plaintiff may in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due to that Plaintiff under this Consent Decree.

66.  Stipulated penalties shall continue to accrue as provided in Paragraph 64 during any Dispute Resolution under Section XI, but need not be paid until the following:

a.  If the dispute is resolved by agreement or by a decision of EPA or the applicable State that is not appealed to the Court, Defendants shall pay accrued penalties determined to be owed, together with interest, to the United States and the States within 30 Days of the effective date of the agreement or the receipt of EPA's or the State's decision or order.

b.  If the dispute is appealed to the Court and the United States or the States prevail in whole or in part, Defendants shall pay all accrued penalties determined by the Court to be owing, together with interest, to the United States and the States within 60 Days of receiving the Court's decision or order, except as provided in subparagraph (c), below.

c.  If any Party appeals the Court's decision, Defendants shall pay all accrued penalties determined to be owing, together with interest, within 15 Days of receiving the final appellate court decision.

67.  If Defendants fail to pay stipulated penalties according to the terms of this Consent Decree, Defendants shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due.  Nothing in this Paragraph shall be construed to limit

the United States or the States from seeking any remedy otherwise provided by law for Defendants' failure to pay any stipulated penalties.

68.     Subject to the provisions of Section XIII of this Consent Decree (Effect of Settlement/Reservation of Rights), the stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the United States or the States for Defendants' violation of this Consent Decree or applicable law.  Where a violation of this Consent Decree is also a violation of relevant statutory or regulatory requirements, Defendants shall be allowed a credit, for any stipulated penalties paid, against any statutory penalties imposed for such violation.

69.     <u>Non-Compliance with Consent Decree</u>.  The following stipulated penalties shall accrue per violation per Day for each violation of any requirement of Paragraphs 10-12 (transfer of Facilities); Section V (Civil Penalty); Section VI (Compliance Requirements); Section VII (Injunctive Relief); and Section XII (Information Collection and Retention) of this Consent Decree, except as otherwise provided in Paragraph 74:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $1,000 per Day or portion thereof | 1st through 14th Day |
| $2,500 per Day or portion thereof | 15th through 30th Day |
| $4,500 per Day or portion thereof | 31st Day and beyond |

70.     <u>Non-Compliance with Reporting Requirements</u>.  The following stipulated penalties shall accrue per violation per Day for each violation of the Reporting Requirements under Section VIII of this Consent Decree:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $250 per Day or portion thereof | 1st through 14th Day |
| $500 per Day or portion thereof | 15th through 30th Day |
| $1,250 per Day or portion thereof | 31st Day and beyond |

71.     Defendants shall pay any stipulated penalty pursuant to Paragraphs 69 and 70 to the United States and the States within 30 Days of receiving a written demand by any Plaintiff.  The Plaintiff making a demand for payment of a stipulated penalty shall simultaneously send a copy of the demand to the other Plaintiffs.

72.     Defendants shall pay 50 percent of any stipulated penalty pursuant to Paragraphs 69 and 70 to the United States, 44.75 percent to West Virginia, 4.25 percent to Virginia, and 1 percent to Pennsylvania.

73.     Defendants shall pay stipulated penalties owing to the United States pursuant to Paragraphs 69 and 70 in the manner set forth in Paragraph 18 and with the confirmation notices and transmittal letter information required by Paragraph 18, except that the transmittal letter shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid.  Defendants shall pay stipulated penalties owing to the States pursuant to Paragraphs 69 and 70 in the manner set forth in Paragraphs 19-21, except that the confirmation notice shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid.

74.     <u>Non-Compliance with NPDES Permit Limits.</u>  The following stipulated penalties shall accrue for each Effluent Limit Violation that occurs at an ICG Facility after the Effective Date of this Consent Decree:

| <u>Per Daily Violation</u> | <u>Period of Noncompliance</u> |
|---|---|
| $1,000 | First Daily Violation; Category 1 Daily Violation |
| $5,000 | Category 2 Daily Violation; Category 3 Daily Violation |
| $10,000 | Category 3 Daily Violation pursuant to Paragraph 52(a)(iv) |

| <u>Per Monthly Violation</u> | <u>Period of Noncompliance</u> |
|---|---|

40

| $2,000 | Category 1 Monthly Violation |
| $10,000 | Category 2 Monthly Violation; Category 3 Monthly Violation |
| $20,000 | Category 3 Monthly Violation pursuant to Paragraph 52(b)(iv) |

75.   Defendants shall pay all stipulated penalties due pursuant to Paragraph 74 at the end of the month following the end of each quarter (i.e., by April 30, July 31, October 31, and January 31). Defendants shall pay 50 percent of stipulated penalties due pursuant to Paragraph 74 to the United States. Defendants shall pay the remaining 50 percent of stipulated penalties due pursuant to Paragraph 74 to the State in which the violation occurred, or to the United States if the violation did not occur in West Virginia, Virginia, or Pennsylvania.

76.   Defendants shall make payments to the United States for stipulated penalties due pursuant to Paragraph 74 by FedWire Electronic Funds Transfer following the procedure specified in Paragraph 18, and notice of such payment shall be sent to EPA with Defendants' quarterly reports required by Paragraph 56. Defendants shall make payments to the States following the procedure specified in Paragraphs 19 and 20, and notice of such payment shall be sent to the States with Defendants' quarterly reports required by Paragraph 56.

77.   Defendants shall not be required to pay stipulated penalties pursuant to Paragraph 74 if they have paid stipulated penalties under the pre-existing state settlements identified in Paragraph H(vi) for the same Effluent Limit Violation. Under those circumstances, Defendants shall provide proof of payment of the stipulated penalty to the applicable state with the quarterly reports required by Paragraph 56.

78.   ICG Kentucky Defendants shall not be required to pay stipulated penalties pursuant to Paragraph 74 for an Effluent Limit Violation that occurs in Kentucky unless they are required to

41

comply with the Effluent Limit Violation Response provisions for that Outlet pursuant to Paragraph 8.

## X.  FORCE MAJEURE

79.    "Force Majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Defendants, of any entity controlled by Defendants, or of Defendants' contractors, that delays or prevents the performance of any obligation under this Consent Decree despite Defendants' best efforts to fulfill the obligation.  The requirement that Defendants exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential Force Majeure event and best efforts to address the effects of any such event (a) as it is occurring and (b) after it has occurred to prevent or minimize any resulting delay to the greatest extent possible.  "Force Majeure" does not include Defendants' financial inability to perform any obligation under this Consent Decree.

80.    If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a Force Majeure event, Defendants shall provide notice orally or by electronic or facsimile transmission to EPA and the States within 72 hours of when Defendants first knew that the event might cause a delay.  Within 7 Days thereafter, Defendants shall provide in writing to EPA and the States an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Defendants' rationale for attributing such delay to a Force Majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of Defendants, such event may cause or contribute to an endangerment to public health, welfare or

the environment.  Defendants shall include with any notice all available documentation supporting the claim that the delay was attributable to a Force Majeure.  Failure to comply with the above requirements shall preclude Defendants from asserting any claim of Force Majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure. Defendants shall be deemed to know of any circumstance of which Defendants, any entity controlled by Defendants, or Defendants' contractors knew or should have known.

81.    If EPA, after a reasonable opportunity for review and comment by the States, agrees that the delay or anticipated delay is attributable to a Force Majeure event, the time for performance of the obligations under this Consent Decree that are affected by the Force Majeure event will be extended by EPA, after a reasonable opportunity for review and comment by the States, for such time as is necessary to complete those obligations.  An extension of the time for performance of the obligations affected by the Force Majeure event shall not, of itself, extend the time for performance of any other obligation.  EPA will notify Defendants in writing of the length of the extension, if any, for performance of the obligations affected by the Force Majeure event.

82.    If EPA, after a reasonable opportunity for review and comment by the States, does not agree that the delay or anticipated delay has been or will be caused by a Force Majeure event, EPA will notify Defendants in writing of its decision.

83.    If Defendants elect to invoke the dispute resolution procedures set forth in Section XI (Dispute Resolution) in response to EPA's determination in Paragraph 82, it shall do so no later than 20 Days after receipt of EPA's notice.  In any such proceeding, Defendants shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a Force Majeure event, that the duration of the delay or the extension sought was or will

43

be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Defendants complied with the requirements of Paragraphs 79 and 80, above. If Defendants carry this burden, the delay at issue shall be deemed not to be a violation of the affected obligation of this Consent Decree identified to EPA and the Court.

## XI.  **DISPUTE RESOLUTION**

84.     Unless otherwise expressly provided for in this Consent Decree, the Dispute Resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree.  Defendants' failure to seek resolution of a dispute under this Section shall preclude Defendants from raising any such issue as a defense to an action by the United States or the States to enforce any obligation of Defendants arising under this Decree.

85.     Informal Dispute Resolution.  Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations.  The dispute shall be considered to have arisen when Defendants send the United States and the affected States a written Notice of Dispute.  The Notice of Dispute shall state clearly the matter in dispute.  The period of informal negotiations shall not exceed 30 Days from the date the dispute arises, unless that period is modified by written agreement.  If the Parties cannot resolve a dispute by informal negotiations, then the position advanced by the United States, after consultation with the affected States, shall be considered binding unless, within 15 Days after the conclusion of the informal negotiation period, Defendants invoke formal dispute resolution procedures as set forth below.

86.     Formal Dispute Resolution.  Defendants shall invoke formal dispute resolution procedures, within the time period provided in the preceding Paragraph, by serving on the United States and the affected States a written Statement of Position regarding the matter in dispute.  The

44

Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Defendants' position and any supporting documentation relied upon by Defendants.

87.     The United States shall serve its Statement of Position within 45 Days of receipt of Defendants' Statement of Position. The United States' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the United States, and shall be developed in consultation with the affected States. The United States' Statement of Position shall be binding on Defendants, unless Defendants file a motion for judicial review of the dispute in accordance with Paragraph 89.

88.     An administrative record of the dispute shall be maintained by EPA and shall contain all Statements of Position, including supporting documentation, submitted pursuant to this Section.

89.     Defendants may seek judicial review of the dispute by filing with the Court and serving on the United States and the States, in accordance with Section XV of this Consent Decree (Notices), a motion requesting judicial resolution of the dispute. The motion must be filed within 20 Days of receipt of the United States' Statement of Position pursuant to Paragraph 87. The motion shall contain a written statement of Defendants' position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of this Consent Decree.

90.     The United States and/or the States shall respond to Defendants' motion within the time period allowed by the Local Rules of this Court. Defendants may file a reply memorandum, to the extent permitted by the Local Rules.

91.     Standard of Review

a.     Disputes Concerning Matters Accorded Record Review.  Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraph 86 pertaining to the adequacy or appropriateness of plans, procedures to implement plans, schedules or any other items requiring approval by EPA under this Consent Decree; the adequacy of the performance of work undertaken pursuant to this Consent Decree; and all other disputes that are accorded review on the administrative record under applicable principles of administrative law, Defendants shall have the burden of demonstrating, based on the administrative record, that the position of the United States is arbitrary and capricious or otherwise not in accordance with law.

b.     Other Disputes.  Except as otherwise provided in this Consent Decree, in any other dispute brought under Paragraph 86, Defendants shall bear the burden of demonstrating that its position fulfills the terms, conditions, requirements, and objectives of this Consent Decree.

92.     The invocation of Dispute Resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Defendants under this Consent Decree, unless and until final resolution of the dispute so provides.  Stipulated penalties with respect to the disputed matter shall continue to accrue from the first Day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraph 66.  If Defendants do not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section IX (Stipulated Penalties).

## XII.  INFORMATION COLLECTION AND RETENTION

93.     The United States, the States, and their designated representatives, including attorneys, contractors, and consultants, shall have the right of entry onto any property under the

46

ownership or control of the Defendants, at all reasonable times, upon presentation of credentials, to:

   a.  monitor the progress of activities required under this Consent Decree;

   b.  verify any data or information submitted to the United States in accordance with the terms of this Consent Decree;

   c.  obtain samples and, upon request, splits of any samples taken by Defendants or its representatives, contractors, or consultants relating to Defendants' compliance with this Consent Decree;

   d.  obtain documentary evidence, including photographs and similar data relating to Defendants' compliance with this Consent Decree; and

   e.  assess Defendants' compliance with this Consent Decree.

  94.  Upon request, Defendants shall provide EPA and the States or their authorized representatives splits of any samples taken by Defendants relating to the ICG Facilities' compliance with this Consent Decree. Upon request, EPA and the States shall provide Defendants splits of any samples relating to the ICG Facilities' compliance with this Consent Decree taken by EPA or the States.

  95.  Until three years after the termination of this Consent Decree, Defendants shall retain, and shall instruct its contractors and agents to preserve, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in its or its contractors' or agents' possession or control, or that come into its or its contractors' or agents' possession or control, and that relate in any manner to Defendants' performance of its obligations under this Consent Decree. The foregoing may be maintained electronically. This information-retention requirement shall apply regardless of any contrary corporate or institutional

47

policies or procedures.  At any time during this information-retention period, upon request by the United States or the States, Defendants shall provide copies of any non-privileged documents, records, or other information required to be maintained under this Paragraph.

96.     At the conclusion of the information-retention period provided in the preceding Paragraph, Defendants shall notify the United States and the States at least 60 Days prior to the destruction of any documents, records, or other information subject to the requirements of the preceding Paragraph and, upon request by the United States or the States, Defendants shall deliver copies of any such non-privileged documents, records, or other information to EPA or the States. After the expiration of the 60-Day period identified in this Paragraph, Defendants' obligations with respect to document retention under this Decree shall terminate and Defendants shall be entitled to reinstate the application of its standard document retention policies.

97.     Defendants may assert that information required to be provided to the United States or the States under Paragraphs 95 and 96 of this Decree is privileged under the attorney-client privilege or any other privilege recognized by federal law.  If Defendants assert such a privilege, they shall provide the following: (a) the title of the document, record, or information; (b) the date of the document, record, or information; (c) the name and title of each author of the document, record, or information; (d) the name and title of each addressee and recipient; (e) a description of the subject of the document, record, or information; and (f) the privilege asserted by Defendants.  However, no documents, records, or other information required to be created or generated pursuant to the requirements of this Consent Decree shall be withheld on grounds of privilege.

98.     Defendants may assert that information provided to the United States, West Virginia, or Pennsylvania under this Decree is protected as Confidential Business Information ("CBI") by

48

following the procedures set forth in 40 C.F.R. Part 2, West Virginia Code § 29B-1-4(a)(1), or 65 P.S. §§ 67.707 & 67.708, as applicable. The United States, West Virginia, and Pennsylvania will treat such materials in accordance with the applicable federal or state CBI regulations.

99.     This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States or the States pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of Defendants to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

### XIII.   EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

100.    This Consent Decree resolves the civil claims of the United States and the States for the violations alleged in the Complaint filed in this action, as identified in Appendices A and B attached thereto to the Complaint.

101.    The United States and the States reserve all legal and equitable remedies available to enforce the provisions of this Consent Decree, except as expressly stated in Paragraph 100. This Consent Decree shall not be construed to limit the rights of the United States or the States to obtain penalties or injunctive relief under the Act or implementing regulations, or under other federal or state laws, regulations, or permit conditions, except as expressly specified in Paragraph 100.

102.    In any subsequent administrative or judicial proceeding initiated by the United States or the States for injunctive relief, civil penalties, or other appropriate relief relating to the Defendants' violations, Defendants shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the

49

United States or the States in the subsequent proceeding were or should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraph 100 of this Section.

103.    This Consent Decree is not a permit, or a modification of any permit, under any federal, state, or local laws or regulations.  Defendants are responsible for achieving and maintaining complete compliance with all applicable federal, state, and local laws, regulations, and permits; and Defendants' compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein.  The United States and the States do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that Defendants' compliance with any aspect of this Consent Decree shall result in compliance with provisions of the Act, 33 U.S.C. § 1311, *et seq.*, or with any other provisions of federal, state, or local laws, regulations, or permits.  Application for construction grants, State Revolving Loan Funds, or any other grants or loans, or other delays caused by inadequate facility planning or plans and specifications on the part of Defendants shall not be cause for extension of any required compliance date in this Consent Decree.

104.    This Consent Decree does not limit or affect the rights of Defendants or of the United States or the States against any third parties, not party to this Consent Decree, nor does it limit the rights of third parties, not party to this Consent Decree, against Defendants, except as otherwise provided by law.  In any suit brought by third parties, Defendants reserve the right to argue that this Consent Decree constitutes diligent prosecution pursuant to 33 U.S.C. § 1365.

105.    This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third-party not party to this Consent Decree.

106.    By the execution of this Consent Decree, Defendants release and shall hold harmless the United States and the States, and their instrumentalities, agents, and employees, in their official and personal capacities, of any and all liability or claims arising out of or otherwise related to the negotiations leading to this Consent Decree and all matters contained therein.

## XIV.  COSTS

107.    The Parties shall bear their own costs of this action, including attorneys' fees, except that the United States and the States shall each be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due hereunder but not paid by Defendants.

## XV.  NOTICES

108.    Unless otherwise specified herein, whenever notifications, submissions, reports, or communications are required by this Consent Decree, they shall be made in writing and addressed as follows:

To the United States:

By email:    eescdcopy.enrd@usdoj.gov
             Re: DJ # 90-5-1-1-09476/3

By mail:     EES Case Management Unit
             Environment and Natural Resources Division
             U.S. Department of Justice
             P.O. Box 7611
             Washington, D.C.  20044-7611
             Re: DJ # 90-5-1-1-09476/3

             Director, Office of Civil Enforcement
             U.S. Environmental Protection Agency
             Ariel Rios Building, 2241A
             1200 Pennsylvania Ave., N.W.
             Washington, D.C. 20460

51

NPDES Enforcement Branch Chief
U.S. EPA Region III
1650 Arch Street, 3WP42
Philadelphia, PA 19103

NPDES Permitting & Enforcement Branch Chief
U.S. EPA Region IV
Sam Nunn Federal Building
61 Forsyth Street, S.W.
Atlanta, GA 30303

To EPA:

By mail:       Director, Office of Civil Enforcement
               U.S. Environmental Protection Agency
               Ariel Rios Building, 2241A
               1200 Pennsylvania Ave., N.W.
               Washington, D.C. 20460

               NPDES Enforcement Branch Chief
               U.S. EPA Region III
               1650 Arch Street, 3WP42
               Philadelphia, PA 19103

               NDPES Permitting & Enforcement Branch Chief
               U.S. EPA Region IV
               Sam Nunn Federal Building
               61 Forsyth Street, S.W.
               Atlanta, GA 30303-8960

To the State of West Virginia

By mail:       Assistant Director, Inspection and Enforcement
               Division of Mining and Reclamation
               West Virginia Department of Environmental Protection
               601 57th Street, SE
               Charleston, WV 25304

               Director, Division of Mining and Reclamation
               West Virginia Department of Environmental Protection
               601 57th Street, SE
               Charleston, WV 25304

Chief, Office of Legal Services
West Virginia Department of Environmental Protection
601 57th Street, SE
Charleston, WV 25304

To the Commonwealth of Virginia

By email:      dmlrinfo@dmme.virginia.gov

By mail:       Legal Services Officer
               Virginia Department of Mines Minerals and Energy
               Division Of Mined Land Reclamation
               P.O. Drawer 900
               Big Stone Gap, Virginia 24218

To the Commonwealth of Pennsylvania

By email:      jstefanko@pa.gov

By mail:       Deputy Secretary
               Office of Active and Abandoned Mine Operations
               16th Floor, Rachel Carson State Office Building
               P.O. Box 2063
               Harrisburg, PA 17105-2063

To Defendants:

By mail:       General Counsel
               Arch Coal, Inc.
               One CityPlace Drive, Ste. 300
               St. Louis, MO 63141

109.    Any Party may, by written notice to the other Parties, change its designated notice

recipient or notice address provided above.

110.    Notices submitted pursuant to this Section shall be deemed submitted upon mailing,

unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XVI.   RETENTION OF JURISDICTION

111.    The Court shall retain jurisdiction over this case until termination of this Consent

Decree, for the purpose of resolving disputes arising under this Decree or entering orders modifying this Decree, pursuant to Sections XI (Dispute Resolution) or XVII (Modification) or effectuating or enforcing compliance with the terms of this Decree.

## XVII.  MODIFICATION

112.    The terms of this Consent Decree, including any attached appendices, may be modified only by a subsequent written agreement signed by all the Parties.  Where the modification constitutes a material change to this Decree, it shall be effective only upon approval by the Court. Deadline extensions of less than 45 Days shall not be considered a material change to the Decree requiring Court approval.

113.    Any disputes concerning modification of this Decree shall be resolved pursuant to Section XI of this Decree (Dispute Resolution); provided, however, that, instead of the burden of proof provided by Paragraph 91, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XVIII.  TERMINATION

114.    After Defendants have completed the requirements of Paragraphs 34-41 (Compliance Management System and CMS Audit) of this Decree and have thereafter maintained continuous satisfactory compliance with Section VI (Compliance Requirements), Section VII (Injunctive Relief), and Section VIII (Reporting Requirements) of this Consent Decree for a period of three years; and have paid the civil penalty and any accrued stipulated penalties as required by this Consent Decree, Defendants may serve upon the United States and the States a Request for Termination, stating that Defendants have satisfied those requirements, together with all necessary supporting documentation.

115.    Following receipt by the United States and the States of Defendants' Request for Termination, the Parties shall confer informally concerning the Request and any disagreement that the Parties may have as to whether Defendants have satisfactorily complied with the requirements for termination of this Consent Decree.  If the United States, after consultation with the States, agrees that the Decree may be terminated, the Parties shall submit, for the Court's approval, a joint stipulation terminating the Decree.

116.    If the United States, after consultation with the States, does not agree that the Consent Decree may be terminated, Defendants may invoke Dispute Resolution under Section XI of this Consent Decree.  However, Defendants shall not seek Dispute Resolution of any dispute regarding termination, under Paragraph 86 of Section XI, until 30 Days after service of their Request for Termination.

## XIX.  PUBLIC PARTICIPATION

117.    This Consent Decree shall be lodged with the Court for a period of not less than 30 Days for public notice and comment in accordance with 28 C.F.R. § 50.7.  The United States reserves the right to withdraw or withhold its consent if the comments regarding this Consent Decree disclose facts or considerations indicating that this Consent Decree is inappropriate, improper, or inadequate.  Defendants consent to entry of this Consent Decree without further notice and agree not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Decree, unless the United States has notified Defendants in writing that it no longer supports entry of the Decree.

## XX.  SIGNATORIES/SERVICE

118.    Each undersigned representative of the Defendants, the Assistant Attorney General for

the Environment and Natural Resources Division of the Department of Justice, and the undersigned representative of the States certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

119.    This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis.  Defendants agree to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons.

## XXI.  <u>INTEGRATION</u>

120.    This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.  Other than deliverables that are subsequently submitted and approved pursuant to this Decree, no other document, nor any representation, inducement, agreement, understanding, or promise, constitutes any part of this Decree or the settlement it represents, nor shall it be used in construing the terms of this Decree.

## XXII.  <u>FINAL JUDGMENT</u>

121.    Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the United States, the States, and Defendants.  The Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

## XXIII.  <u>APPENDICES</u>

122.   The following appendices are attached to and part of this Consent Decree:

Appendix A: Audit Protocol

So Ordered This _____ Day of _____, 2015.

_____
United States District Judge
Southern District of West Virginia

THE UNDERSIGNED PARTIES enter into this Consent Decree in the matter of *United States, et al. v. Arch Coal Inc., et al.*

FOR THE UNITED STATES OF AMERICA

Date: 7/29/15

JOHN C. CRUDEN
Assistant Attorney General
Environment and Natural Resources Division

Date: 7/29/15

LAURA A. THOMS
STACY D. COLEMAN
Trial Attorneys
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C.  20044

THE UNDERSIGNED PARTIES enter into this Consent Decree in the matter of *United States, et al. v. Arch Coal, Inc., et al.*

FOR THE UNITED STATES OF AMERICA

R. BOOTH GOODWIN II
United States Attorney

Date: _____

GARY L. CALL
Assistant United States Attorney
WV State Bar Number 589
P.O. Box 1713
Charleston, WV 25326
Tel: 304-345-2200
Fax: 304-347-5440
E-mail: gary.call@usdoj.gov

THE UNDERSIGNED PARTIES enter into this Consent Decree in the matter of *United States, et al. v. Arch Coal, Inc., et al.*

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

Date: 7/17/15

CYNTHIA J. GILES
Assistant Administrator
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
William J. Clinton Building, South
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460

Date: 7/16/15

SUSAN SHINKMAN
Director, Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
William J. Clinton Building, South
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460

Date: 7/15/15

MARK POLLINS
Director, Water Enforcement Division
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
William J. Clinton Building South
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460

Date: 7/14/2015

ROBERT D. FENTRESS
Attorney-Advisor, Water Enforcement Division
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
William J. Clinton Building South,
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460

60

THE UNDERSIGNED PARTIES enter into this Consent Decree in the matter of *United States, et al. v. Arch Coal, Inc., et al.*

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

Date: 7/10/15

SHAWN M. GARVIN
Regional Administrator
U.S. Environmental Protection Agency, Region III
1650 Arch Street
Philadelphia, PA 19103-2029

Date: 6/26/15

MARY B. COE
Acting Regional Counsel
U.S. Environmental Protection Agency, Region III
1650 Arch Street
Philadelphia, PA 19103-2029

Date: 6/22/15

DOUGLAS FRANKENTHALER
Assistant Regional Counsel
U.S. Environmental Protection Agency, Region III
1650 Arch Street
Philadelphia, PA 19103-2029

THE UNDERSIGNED PARTIES enter into this Consent Decree in the matter of *United States, et al. v. Arch Coal, Inc., et al.*

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

Date: 7/23/15

MARY WILKES
Regional Counsel
Office of Regional Counsel
U.S. Environmental Protection Agency, Region IV
61 Forsyth Street S.W.
Atlanta, Georgia 30303-8960
404-562-9535
404-562-9486 (fax)

Date: 7/23/15

MICHELE WETHERINGTON
Associate Regional Counsel
U.S. Environmental Protection Agency, Region IV
61 Forsyth Street S.W.
Atlanta, Georgia 30303-8960
404-562-9613
404-562-9486 (fax)

THE UNDERSIGNED PARTIES enter into this Consent Decree in the matter of *United States, et al. v. Arch Coal, Inc., et al.*

FOR THE WEST VIRGINIA DEPARTMENT OF
ENVIRONMENTAL PROTECTION

Date: 6-16-15

Harold D. Ward
Acting Director
Division of Mining and Reclamation
West Virginia Department of Environmental Protection
601 57th Street Southeast
Charleston WV 25304
Telephone: (304) 926-0440

63

THE UNDERSIGNED PARTIES enter into this Consent Decree in the matter of *United States, et al. v. Arch Coal Inc., et al.*

FOR THE COMMONWEALTH OF VIRGINIA

M. Hudson McClanahan (WVSB No.: 7997)
Special Assistant Attorney General
Office of Virginia Attorney General
Burruss Hall, Suite 236, Virginia Tech
800 Drillfield Drive
Blacksburg, Virginia 24060
(540) 231-6293 - Direct Dial
(540) 231-6474 - Fax
hud3@vt.edu

64

THE UNDERSIGNED PARTIES enter into this Consent Decree in the matter of *United States, et al. v. Arch Coal, Inc., et al.*

FOR THE PENNSYLVANIA DEPARTMENT OF
ENVIRONMENTAL PROTECTION

Date: _6/5/15_

John Stefanko
Deputy Secretary
Office of Active and Abandoned Mining Operations

Date: _6/5/15_

Alicia R. Pake
Assistant Counsel
Office of Chief Counsel
Department of Environmental Protection
Southcentral Regional Office
909 Elmerton Avenue
Harrisburg, PA 17110-8200

THE UNDERSIGNED PARTIES enter into this Consent Decree in the matter of *United States, et al. v. Arch Coal, Inc., et al.*

FOR DEFENDANTS ARCH COAL, INC., HAWTHORNE COAL CO., INC.; ICG BECKLEY, LLC; ICG EAST KENTUCKY, LLC; ICG EASTERN, LLC; ICG KNOTT COUNTY, LLC; ICG TYGART VALLEY, LLC; JULIANA MINING COMPANY, INC.; KING KNOB COAL COMPANY, INC.; PATRIOT MINING COMPANY, INC.; POWELL MOUNTAIN ENERGY, LLC; THE SYCAMORE GROUP, LLC; UPSHUR PROPERTY, INC.; VINDEX ENERGY CORP.; WHITE WOLF ENERGY, INC.; and WOLF RUN MINING CO.

_____   ____

Robert G. Jones
Senior Vice President Law and General Counsel
Arch Coal, Inc.

66

THE UNDERSIGNED PARTIES enter into this Consent Decree in the matter of *United States, et al. v. Arch Coal, Inc., et al.*

FOR THE PENNSYLVANIA DEPARTMENT OF ENVIRONMENTAL PROTECTION

Date: 6/5/15

John Stefanko
Deputy Secretary
Office of Active and Abandoned Mining Operations

Date: 6/5/15

Alicia R. Duke
Assistant Counsel
Office of Chief Counsel
Department of Environmental Protection
Southcentral Regional Office
909 Elmerton Avenue
Harrisburg, PA 17110-8200